UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


ANTHONY STERLING, M.D.

     Plaintiff,

v.                        CASE No. 8:06-CV-2334-T-TGW

PROVIDENT LIFE AND
ACCIDENT INS. CO. and
UNUMPROVIDENT CORP.,[1]

     Defendants.

_____


## O R D E R


     The plaintiff asserts several claims against the defendants arising

from the discontinuation of his disability insurance benefits. Defendant

UnumProvident ("Unum") has filed a Motion for Summary Judgment on all

of the plaintiff's claims and defendant Provident Life and Accident Insurance

Company ("Provident") seeks summary judgment in its favor on all but the

---

[1] UnumProvident changed its name to Unum Group ( Doc. 59-2, ¶ 2). Provident merged with Unum in 1999, thereby making Provident a wholly owned subsidiary of Unum (id., ¶¶ 2, 3).

plaintiff's breach of contract claim (Doc. 59). The plaintiff has filed an opposition memorandum (Doc. 68).

Summary judgment will be granted for the defendants on the plaintiff's claims that the defendants violated the Connecticut Unfair Trade Practices Act and the Connecticut Unfair Insurance Practices Act (Counts Five and Six), and the plaintiff's contention in Count Two that the defendants' conduct prior to May 15, 2006, breached Connecticut's common law duty of good faith and fair dealing, because the plaintiff has failed to create a genuine issue of material fact on these claims and the defendants are entitled to judgment as a matter of law. Further, the plaintiff's allegation of repudiation (contained in Count One) and his claim for punitive damages (contained in Count Two) will be stricken because the plaintiff has failed to create a triable issue on these contentions. However, the motion will be denied as to the plaintiff's claims of negligent infliction of emotional distress and breach of common law duty of good faith and fair dealing on, and after, May 15, 2006, because genuine issues of material fact exist as to these claims. Furthermore, Unum's Motion for Partial Summary Judgment on the claims of breach of contract and breach of common law duty of good faith and fair dealing on the

-2-

ground that it was not a party to the insurance contract will be denied because further development of this contention is warranted.

I.

The plaintiff, Dr. Anthony Sterling, was an orthopedic surgeon who practiced medicine in Connecticut. In 1983, defendant Provident issued to the plaintiff disability income policy no. 6-334-550334 ("the policy"), which provided monthly benefits of $9,000 in the event of total disability (Doc. 59-3). The benefits were for the plaintiff's lifetime for a disabling "accidental bodily injury" occurring before age 65, or until age 65 for a disabling sickness commencing between ages 50-65 (id., pp. 3, 5).

In the summer of 1998, the plaintiff, who has a history of cervical spine disease, began experiencing neck pain, cramping in his left hand, and spasms in his left wrist and fingers (see Doc. 59-4). An MRI scan showed that the plaintiff had a large osteophyte (bone spur) in his cervical spine causing canal stenosis and marked impingement upon his spinal cord (id.). Surgery to remove the spur and decompress the spinal cord was recommended (id.). The plaintiff was forewarned that, even after a successful operation, he may not be able to continue as a surgeon (id.; Doc. 59-7).

Prior to the surgery, the plaintiff completed a disability claim form because he expected to be temporarily disabled while he recuperated from the surgery (see Doc. 59-6). In response to the question, "When did sickness commence (if applicable)," he wrote, "past month," and identified "severe spinal stenosis cervical spine" as the impairment (id.).[2] He indicated that he expected to be disabled for approximately six months (see id.). The plaintiff was 57 years old at the time of the surgery.

On September 8, 1998, Dr. Gary M. Bloomgarden performed cervical surgery on the plaintiff (see Doc. 59-8). The operative report indicates that "the calcifications were molded into the dura [the outermost membrane of the spinal cord] and firmly poking into the spinal cord" (id., p. 3). Dr. Bloomgarden noted that they "were able to drill off the calcified ligament on the right side, but along with it went the dura to the point that we could actually visualize the anterior aspect of the spinal cord bowing into our decompression....Unfortunately, on the inferior aspect, we were unable to remove the entire osteophyte..." (id.). No surgical complications were

---

[2]In response to the question, "When did the accident occur (if applicable)," he wrote, "N/A" (Doc. 59-6).

identified in the operative report (id., p. 1). However, when the plaintiff awoke from surgery, his left arm was paralyzed (Doc. 68-14, p. 48).[3]

On September 21, 1998, Provident received the plaintiff's disability claim form that he had previously completed (see Doc. 59-6). In October 1998, the plaintiff spoke with claims representative, Nancy Smith, and Carolyn Craig, a nurse employed by the defendants (see Doc. 57, PLACL00375, 00385). The plaintiff informed them that his left arm was paralyzed due to a leak in his spinal column during surgery (id.). The plaintiff estimated that it would be five to eighteen months before he could return to work (id., PLACL00385-86).

In a letter dated January 9, 1999, Provident informed the plaintiff that he would be receiving disability payments "as a result of [his] sickness" (Doc. 59, Ex. 10). Howard Kantrovitz, the plaintiff's attorney at the time, was sent a copy of this correspondence (see id.).

---

[3]During his deposition in June 2008, Dr. Bloomgarden stated that the plaintiff's paralysis was caused by an unintended and unexpected injury to the C-7 nerve root during surgery (Doc. 68-4, p. 7). However, he does not know what he did to injure the nerve root (id., pp. 12, 18-19), and this circumstance is not noted in the operative record (see Doc. 59-8).

In March 1999, Al Baldassarri, an employee of the defendants, met with the plaintiff in Kantrovitz's presence regarding the status of the plaintiff's arm and his plans for returning to work (Doc. 68-6, p. 26; Doc. 57, PLACL00142-46). The plaintiff told Baldassarri that he continued to experience paralysis in his left hand as a result of a spinal fluid leak during surgery and that he was informed that he may regain additional use of his hand over the next two to three years (Doc. 57, PLACL00143).

The plaintiff's disability persisted and he continued to receive monthly disability payments of $9,000 under this policy for approximately seven and one-half years, totaling more than $823,000 (see Doc. 59-12, p. 3). The plaintiff stated that he did not have any complaints with the company's handling of this policy "as long as they were sending [him] what [he] was entitled to" (Doc. 59-21, p. 1).

In correspondence dated March 30, 2006, Provident informed the plaintiff that the benefit period for the policy was scheduled to expire on July 17, 2006 (Doc. 57, PLACL00489). This is consistent with the policy provision that benefits payable for disability grounded in sickness end at age 65, as Dr. Sterling reached age 65 on June 23, 2006 (see Doc. 59-3).

The plaintiff's disability claim was closed on May 11, 2006 (Doc. 68-2, pp. 16-17). On May 15, 2006, the plaintiff told Anila Skende, a disability benefits coordinator, that his disability was not due to sickness, but was caused by an injury to his spinal cord during surgery (Doc. 68-9, pp. 9, 13; Doc. 57, PLACL00577-78). Skende referred the plaintiff's file to her manager, who advised Skende that day to tell the plaintiff that his claim is for sickness, but that he could file an appeal (Doc. 68-9, pp. 13-15; Doc. 57, PLACL00577). The plaintiff, however, did not appeal.

Rather, in July 2006, the plaintiff filed against the defendants a Civil Remedy Notice of Insurer Violation with the Florida Department of Insurance regarding the denial of his injury claim (Doc. 68-9, p. 37; see Doc. 59-12). Specifically, the plaintiff alleged that the claim should be paid as an injury because "[t]he doctor accidentally cut [his] spinal cord and a nerve that resulted in paralysis of [his] left arm, making [him] totally disabled" (see Doc. 59-12). Assuming the permanency of the disability. classification of the plaintiff's disability as an accidental injury would afford him monthly disability benefits for his life (see Doc. 59-3, pp. 3, 5). Suzanne Campbell-

Lambert was assigned to respond to this notice on behalf of the defendants (see Doc. 68-2, pp. 37, 41).

Campbell-Lambert referred the plaintiff's file to in-house orthopedic surgeon, Dr. Joel W. Saks (id., pp. 99-100). Dr. Saks stated that "[n]o indication is present in the records that Dr. Bloomgarden, the surgeon, accidentally cut a nerve or injured the spinal cord" (Doc. 59-14, p. 6). Dr. Saks added, however, that,"[a]ny imaging studies done subsequent to the 9-08-98 surgery, MRI or CT studies should be obtained," and he recommended that a neurosurgeon review the file (id.). The defendants did not obtain these medical records in response to Dr. Saks's recommendation (Doc. 68-2, pp. 106-07).

The defendants subsequently referred the plaintiff's file to neurosurgeon Dr. Vrijesh S. Tantuwaya for his review (id., p. 108; see Doc. 59-15). Dr. Tantuwaya stated in his written report dated September 8, 2006, that the etiology of the plaintiff's restrictions and limitations is twofold: first, the progression of his degenerative disc disease, and second, he had worsening of his deficits postoperatively (Doc. 59-15, p. 8). With regard to the latter, Dr. Tantuwaya stated that the records in his possession did not reflect an

unexpected or unacceptable complication occurring during surgery (id.).

However, he also noted that medical records relevant to the etiology of the

plaintiff's disability were absent from the file, including certain MRI, CT

scans and x-rays (id., pp. 3-5, 9). Thus, with regard to the ultimate issue of

whether the plaintiff suffered an "injury" during surgery, Dr. Tantuwaya

stated (id., p. 9):

> In my opinion, the actual determination of whether
> an unacceptable level of additional "injury" was
> caused during the surgery would ultimately depend
> upon comparison of the preoperative and
> postoperative MRI scans. If there is significant
> worsening of [the] spinal cord injury on the
> postoperative MRI scan...this would suggest that
> some unacceptable degree of additional injury was
> imposed during the course of the surgery but not
> reported by the surgeon....Additionally, if
> intraoperative neurophysiologic monitoring was
> performed, these recordings would help identify
> whether some untoward event happened during
> surgery which was not reported by the operating
> surgeon.

The defendants, however, did not obtain these medical records in

response to Dr. Tantuwaya's recommendation (Doc. 68-2, pp. 111, 114-15,

117-18, 120-21, 184-85). Further, the defendants did not speak with Dr.

Tantuwaya about his report, or contact the plaintiff's surgeon or treating physicians regarding his disability (id., pp. 108-09, 176, 185-86).

On September 15, 2006, a few days after the issuance of Dr. Tantuwaya's report, Campbell-Lambert responded to the plaintiff's Civil Remedy Notice of Insurer Violation (Doc. 59-12). Based on the reports of Drs. Saks and Tantuwaya, she stated that "the information available to us to date does not support the occurrence of an accidental bodily injury..." (id., p. 5). Consequently, she upheld the company's determination that the plaintiff's disability was the result of sickness, not injury, and that the plaintiff was not entitled to any further benefits under the policy (id.).

On December 19, 2006, the plaintiff filed this six-count lawsuit against the defendants relating to the termination of his disability benefits (Doc. 1). The plaintiff alleged breach of contract, breach of Connecticut's common law duty of good faith and fair dealing, intentional and negligent infliction of emotional distress, and violations of Connecticut's Unfair Insurance and Unfair Trade Practices Acts, Conn. General Statutes §§38a-816,

et seq., §§42-110a, et seq. (Doc. 1).[4] The plaintiff seeks damages for past, present and future disability benefits, and for emotional distress, as well as punitive damages and attorney's fees and costs (id.).

The parties subsequently consented in this case to the exercise of jurisdiction by a United States Magistrate Judge (Docs. 42, 43). The defendants thereafter filed a motion for summary judgment (Doc. 59). Defendant Unum seeks summary judgment in its favor on the plaintiff's claims of breach of contract and breach of duty of good faith and fair dealing because it was not a party to the disability insurance policy (id., pp. 8, 15). Additionally, both defendants seek summary judgment on the merits of the plaintiff's remaining claims, except for the breach of contract claim (Doc. 59). The plaintiff has filed a memorandum in opposition to the motion (Doc. 68). Oral argument was subsequently conducted on the motion (Doc. 84).

---

[4]The parties agree that Connecticut law controls this lawsuit, as the causes of action arise from an insurance contract issued and delivered in Connecticut (Doc. 59, pp. 6-7; Doc. 68, p. 6). The claim of intentional infliction of emotional distress was dismissed with prejudice by United States District Judge Elizabeth A. Kovachevich (Doc. 21, p. 23).

II.

The court shall enter summary judgment only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56( c). Material facts are those over which disputes "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The movant bears the burden of establishing the absence of a dispute over material facts. Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

Where the party opposing the summary judgment motion has the burden of proof at trial, the moving party may discharge its initial burden by identifying specific portions of the record which show the absence of evidence to prove the nonmoving party's case at trial. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir. 1991). Alternatively, the movant may come forward with "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." Id. at 1438. If the

moving party does not meet its burden, then the motion for summary judgment will be denied. Id. at 1437.

Where the moving party meets its initial burden, the burden then shifts "to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the party opposing the motion is unable to make a sufficient showing on an element essential to its case on which it has the burden of proof at trial, the movant is entitled to summary judgment. United States v. Four Parcels of Real Property, supra, 941 F.2d at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party. Reynolds v. Bridgestone/Firestone, Inc., supra, 989 F.2d at 469. Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment. Id.

## III.

Defendant Unum alleges that the plaintiff's claims for breach of contract and breach of duty of good faith and fair dealing are not cognizable

against it because it is not a party to the disability insurance contract (Doc. 59, pp. 8-10, 15).

It is undisputed that Unum is not a party to the disability insurance policy, and, in general, "[o]nly parties to a contract may be held liable under the contract." Pro-Fitness, Inc. v. Plankenhorn, 1995 WL 774494 at *1 (Conn. Super. 1995)(unpub. dec.). However, a parent company, such as Unum, may be held liable for the acts of its subsidiary pursuant to Connecticut's "identity" or "instrumentality" rules. Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., 447 A.2d 406, 410 (Conn. 1982); Zaist v. Olson, 227 A.2d 552, 557-58 (Conn. 1967). The plaintiff argues that it is appropriate to disregard Unum's corporate shield under the "identity rule" (Doc. 68, p. 7).

The identity rule has been stated as follows (Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., supra, 447 A.2d at 411):

> If [the] plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an

> operation conducted by one corporation for the
> benefit of the whole enterprise.

There is evidence of unity of interest and ownership in this case. Thus, Provident is a wholly owned subsidiary of Unum (Doc. 59-2, ¶3). They share the same president, CEO, and other corporate officers. Further, the financial interests of the companies appear intertwined (see Doc. 68-13, pp. 5, 17). Moreover, Unum provides claims processing services for Provident (Doc. 68-11, pp. 13-14). In particular, there is evidence suggesting Unum's participation in the processing of the plaintiff's claim (see, e.g., Doc. 68-2, p. 5).

On the other hand, the defendants argue that they maintain separate books and records (Doc. 59-2, ¶¶ 4-6). Further, Provident maintains liability for its policies (id., ¶ 4). Therefore, whether the plaintiff's evidence is sufficient to establish Unum's "complete domination" of Provident is unclear. See Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., supra, 447 A.2d at 411 (In order to pierce the corporate veil, "[t]here must be such domination of finances, policies and practices that the controlled

corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.").

Furthermore, the defendants argued at the hearing that Unum cannot be liable under the identity rule because the plaintiff has failed to show that Provident is an insolvent subsidiary. Although the defendants did not make this contention in their summary judgment motion, there is Connecticut Supreme Court authority which provides some support for it. In <u>Angelo Tomasso, Inc.</u> v. <u>Armor Construction & Paving, Inc.</u>, <u>supra</u>, 447 A.2d at 413, the Connecticut Supreme Court stated that, in addition to showing corporate unity, the identity rule requires evidence that it would be economically unjust to preserve the corporate distinction. Thus, it asserted (<u>id.</u>, n.11 (emphasis in original; quotations and citation omitted)):

> the plain language of th[e identity] rule...operates to pierce the corporate veil where adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting *the economic entity* to escape liability arising out of an operation conducted by *one corporation* for the benefit of the *whole enterprise.*

There is no evidence that Provident would escape liability if the corporate form is adhered to in this case. Thus, the plaintiff has presented no

-16-

evidence that Provident lacks the financial wherewithal to satisfy a judgment against it. To the contrary, the defendants aver that Provident maintains liability for its insurance contracts, and that it is a Tennessee corporation in good standing (Doc. 59-2, ¶¶ 4, 5).

Although the plaintiff has failed to present evidence of this aspect of the identity rule, this argument was not raised by the defendants in their motion for summary judgment. Consequently, the plaintiff has not had an opportunity to respond meaningfully to this contention.

Therefore, Unum's request for summary judgment on Counts One and Two on the basis that it was not a party to the insurance contract is presently denied. Notably, even if Unum had prevailed on this contention, that would not result in its dismissal from this lawsuit, since it would remain a defendant on Count Four for negligent infliction of emotional distress.

IV.

The remainder of the defendants' arguments pertain to the merits of the plaintiff's claims.

A. The defendants seek summary judgment on the plaintiff's contention that the defendants' termination of his disability benefits

"constituted a repudiation of their obligations under the contract" (Doc. 1, ¶ 13). The defendants argue that "[t]here is no reliable, substantial evidence of repudiation or anticipatory breach" in this case (Doc. 59, p. 10).[5]

"A 'repudiation' is defined as a 'manifestation by one party to the other that the first cannot or will not perform at least some of its obligations under the contract.'" Roessler v. New England Glass Enclosures, Inc., 1993 WL 7537 at *5 (Conn. Super. 1993)(unpub. dec.). The general rule is that the denial of insurance benefits based on the policy's terms of coverage does not constitute a repudiation, even if the decision turns out to be erroneous. Mobley v. New York Life Ins. Co., 295 U.S. 632, 638 (1935).[6] Thus, the Supreme Court explained (id.)(citations omitted):

> Repudiation by one party, to be sufficient in any case to entitle the other to treat the contract as absolutely and finally broken and to recover damages as upon total breach, must at least amount to an unqualified refusal, or declaration of inability,

---

[5]The terms anticipatory breach and repudiation are used interchangeably. See Roessler v. New England Glass Enclosures, Inc., 1993 WL 7537 at *5 (Conn. Super. 1993)(unpub. dec.) (citing Farnsworth on Contracts, 2d Ed. (1990), §820).

[6]Although neither party has cited to Connecticut law on this point, there is no reason to believe that this rule, which has widespread approval in federal and state courts, would not extend to Connecticut.

substantially to perform according to the terms of his obligation. Mere refusal, upon mistake or misunderstanding as to matters of fact or upon an erroneous construction of the disability clause, to pay a monthly benefit when due is sufficient to constitute a breach of that provision, but it does not amount to a renunciation or repudiation of the policy.

The plaintiff argues that the "[d]efendants have announced, on numerous occasions, and in no uncertain terms, that they will not honor this obligation" (Doc. 68, p. 11). The plaintiff, however, has not identified any evidence of an unqualified refusal by the defendants to honor the policy (see id.). Rather, the defendants maintain that it terminated the plaintiff's benefits because he did not meet the contract's condition for continued benefits (see Doc. 57, PLACL00489, 577). Such a qualified denial does not show repudiation. See Mobley v. New York Life Ins. Co., supra; see, e.g., Feliberty v. Unumprovident Corp., 2003 WL 22991859 at *3 (N.D. Ill. 2003)(unpub. dec.) (letters that declare insurance payments will end because disability is the result of sickness, not accidental injury, "suggest a dispute over the meaning of a contractual provision, not a wholesale rejection of contractual responsibilities"). Therefore, the plaintiff has not stated a repudiation claim on this basis.

The plaintiff argues further that the defendants denied his disability claim in bad faith, and that an insurer's bad faith denial of an insurance claim may constitute repudiation of the insurance contract (Doc. 68, pp. 10-11). The plaintiff cites no Connecticut law for this proposition, and none has been found.

Moreover, the plaintiff has not asserted a persuasive argument for the creation of such a claim under Connecticut law in the face of the well-established and venerable principle recognized by the Supreme Court in Mobley. Thus, the plaintiff has not shown that the bad faith denial of an insurance claim is a widely recognized basis for a repudiation claim as reflected in the Restatement of Contracts. See generally Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc., 420 F.3d 1317, 1326 n.5 (11th Cir. 2005)(in the absence of state law on the issue, courts may consider jurisprudence from other jurisdictions).[7] Furthermore, Connecticut already

---

[7]The plaintiff cites in support of his argument Greenberg v. Paul Revere Life Ins. Co., 91 Fed.Appx. 539 (9th Cir. 2004)(unpub. dec.) and DeChant v. Monarch Life Ins. Co., 554 N.W.2d 225 (Wis. App. 1996). However, neither case contains any cogent analysis of the issue. Thus, DeChant concludes in a summary manner that an insurer's bad faith breach of a policy constitutes repudiation of the policy based on dicta from another Wisconsin case. 554 N.W.2d at 228-29. Furthermore, Greenberg is inapposite, as it mentions repudiation tangentially in the context of "[t]he availability of 'future benefits' under Arizona tort law." 91 Fed.Appx. at 541.

recognizes a distinct cause of action for the bad faith denial of an insurance claim, see Buckman v. People Express, Inc., 530 A.2d 596 (Conn. 1987), and there is no reason to think that Connecticut intended that circumstance to perform double duty by increasing damages for a breach of contract claim and by establishing a separate claim for damages. Moreover, Connecticut's general recognition that the doctrine of anticipatory repudiation does not apply to unilateral contracts, see Somerville v. Epps, 419 A.2d 909, 911 (Conn. Super. 1980), further undercuts the contention that Connecticut would recognize a repudiation claim based on a bad faith denial of an insurance claim, since, as here, disability insurance policies are regularly regarded as unilateral contracts. See Beaman v. Pacific Mutual Life Ins. Co., 369 F.2d 653, 655-56 (4th Cir. 1966). Therefore, Connecticut law does not, and would not, recognize a repudiation claim based on the bad faith denial of an insurance claim.[8]

---

[8]The plaintiff also argues that its "irrevocably strained" relationship with the defendants warrants an award of future benefits in this case (Doc. 68, pp. 11-12). There is no evidence to support the conclusion that, if the jury finds in the plaintiff's favor, the defendants will not make the monthly payments. See Doe v. Provident Life and Acc. Ins. Co., 936 F.Supp. 302, 307-08 (E.D. Pa. 1996) (allegations of bad faith conduct in the processing of a claim do not show that once a judgment is entered the defendant will improperly deny benefits to the plaintiff).

Consequently, summary judgment will be granted in favor of the

defendants on the plaintiff's repudiation claim contained in Count One of the

plaintiff's complaint (Doc. 1, ¶ 13).  Accordingly, the claim in Count One for

future disability benefits will be deemed stricken.  See New York Life Ins. Co.

v. Viglas, 297 U.S. 672, 678 (1936) ("for breach [of contract] short of

repudiation...the damages...do not exceed the benefits in default at the

commencement of the suit").

B. The defendants also argue that they are entitled to summary

judgment on Count Two of the plaintiff's complaint.  That count alleges that

the defendants breached their common law duty of good faith and fair dealing

to the plaintiff by discontinuing his disability benefits in reckless disregard of

his rights  (Doc. 1, p. 5).

The Connecticut Supreme Court recently discussed this cause of

action in Renaissance Management Co., Inc. v. Connecticut Housing Finance

Authority, 915 A.2d 290 (Conn. 2007).  It stated (id., pp. 297-98)(citations

omitted: internal quotation marks omitted)):

> [I]t is axiomatic that the...duty of good faith and fair
> dealing is a covenant implied into a contract or a
> contractual relationship....In other words, every
> contract carries an implied duty requiring that

> neither party do anything that will injure the right of the other to receive the benefits of the agreement. The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term.... To constitute a breach of the implied covenant of good faith and fair dealing, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith.

The conduct that constitutes "bad faith" is narrowly construed. Thus, as explained in De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 849 A.2d 382, 388 (Conn. 2004)(citation omitted):

> Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive....Bad faith means more than mere negligence; it involves a dishonest purpose.

Therefore, in the insurance context "evidence of a mere coverage dispute or mere negligence in an investigation will not demonstrate a breach of good faith and fair dealing." Uberti v. Lincoln Nat. Life Ins. Co. , 144 F.Supp.2d 90, 104 (D. Conn. 2001).

The defendants argue they are entitled to summary judgment on this claim because they reasonably concluded, based on the opinions of Drs. Saks and Tantuwaya, that the plaintiff's disability was caused by sickness, not injury during surgery (Doc. 59, pp. 16-18), and the "fact that Dr. Sterling disagrees with the insurer's interpretation of the policy...does not establish bad faith" (id., p. 16). See Uberti v. Lincoln Nat. Life Ins. Co., supra; McCulloch v. Hartford Life and Acc. Ins. Co., 363 F.Supp.2d 169, 177-78 (D. Conn. 2005).

The plaintiff responds that this is not a mere coverage dispute; rather, the basis of this count is that the investigation underlying the denial of his claim was inadequate and conducted in bad faith (Doc. 68, pp. 13-14). Furthermore, due to the alleged incomplete investigation, the plaintiff disputes that there is a reasonable basis for the defendants' conclusion that his disability was caused by sickness.

A failure to conduct a reasonable claim investigation may state an actionable bad faith claim. See Uberti v. Lincoln Nat. Life Ins. Co., supra, 144 F.Supp.2d at 104 ("[i]nsureds in Connecticut can expect that insurers will reasonably and adequately investigate claims before denying coverage" and

"an insurer may not cut off benefits on the basis of unsupported determinations resulting from its arbitrary failure or refusal to properly perform the claims examination function"): United Technologies Corp. v. American Home Assurance Co., 118 F.Supp.2d 181, 186-89 (D. Conn. 2000)(recognizing a claim for breach of duty of good faith and fair dealing where an insurer acted with bad faith in the handling of a claim). In this regard, the plaintiff asserts a two-pronged argument: first, that the defendants unreasonably closed his claim in May 2006 without investigating whether his disability was caused by sickness or injury, and, second, that, when the defendants subsequently investigated the etiology of his disability, the investigation was unreasonable and inadequate (see Doc. 68, pp. 16-19). The second aspect of this argument has sufficient merit to preclude summary judgment.

On May 15, 2006, the plaintiff expressly told the defendants that he had been injured during his September 1998 surgery (see Doc. 57, PLACL00577; Doc. 68-9, p. 13). Thus, as of that date, the defendants knew that the plaintiff was claiming that his disability was due to an injury (see Doc.

68-2, pp. 173-74). The plaintiff argues that the defendants' investigation of that claim was incomplete and inadequate.

In particular, the plaintiff emphasizes that the defendants failed to acquire medical records that their own reviewing physicians recommended that they obtain. Thus, when Dr. Saks reviewed the plaintiff's file, he stated (Doc. 59-14, p. 6):

> The consent for surgery likely signed by insured prior to the operation of 9-08-98 should be obtained if available. Any imaging studies done subsequent to the 9-08-98 surgery, MRI or CT studies, should be obtained. If insured had a tube placed in the spine, documentation for this should be obtained including imaging studies, MD notes, operative notes, and hospital discharge summary.

However, the defendants did not obtain imaging and other records in response to Dr. Saks's request (see Doc. 68-2, pp. 106-07). Furthermore, Dr. Tantuwaya stated several times in his report that relevant medical records were absent from the plaintiff's claims file. For example, he said (Doc. 59-19, pp. 2, 3-4):

> If an MRI of the C-spine was performed at this time [in conjunction with an MRI Thoracic Spine Report] it would be of significant importance to have this report and/or the actual films to review.

> It would be crucial for this case to have the actual MRI, CT scan, and x-ray reports or actual films to validate [Dr. Bloomgarden's interpretations]. Of greatest importance would be the MRI to confirm from a third party, other than Dr. Bloomgarden, that there is T2 signal change in the spinal cord at this level preoperatively.

Importantly, Dr. Tantuwaya opined the following regarding the ultimate issue of whether the worsening of the plaintiff's deficits postoperatively is attributable to a surgical "injury" (id, p. 9):

> In my opinion, the actual determination of whether an unacceptable level of additional "injury" was caused during the surgery would ultimately depend upon comparison of the preoperative and postoperative MRI scans. If there is significant worsening of spinal cord injury on the postoperative MRI scan...this would suggest that some unacceptable degree of additional injury was imposed during the course of the surgery but not reported by the surgeon....Additionally, if intraoperative neurophysiologic monitoring was performed, these recordings would help identify whether some untoward event happened during surgery which was not reported by the operating surgeon.

The defendants did not, however, attempt to obtain these recommended medical records in order to respond to the pre-lawsuit notice (see Doc. 68-2, pp. 111, 114-15, 117-18, 120-21, 184-85). Rather, four days after receiving

-27-

Dr. Tantuwaya's report the defendants sent a letter to the plaintiff upholding the denial of his disability claim based on injury (see Doc. 57, PLACL01032).

In this connection, Mary E. Fuller, the plaintiff's expert, states (Doc. 68-13, p. 11):

> UnumProvident...was given recommendations by its own consulting physician to obtain very specific records to try and identify the etiology [of the plaintiff's disability], and still failed to do so....[T]he refusal to...conduct an investigation such as that recommended by its own expert, in my opinion goes beyond mere negligence.

Additionally, Fuller asserts (id., pp. 11-12):

> [I]n the presence of an incomplete investigation, and absent a thorough understanding of the facts, it is difficult if not impossible to establish that the determination [to deny benefits] is fairly debatable.

In fact, Fuller disputes that Dr. Tantuwaya even gave a definitive opinion on causation of the plaintiff's disability. Thus, contrary to the defendants' position, Fuller opines that Dr. Tantuwaya's report ultimately did not state a determination as to the etiology of the plaintiff's disability because he stated that he needed pre- and post-operative studies to make a determination (see id., p. 15).

The plaintiff, moreover, identifies several other purported deficiencies in the defendants' investigation of his claim. Thus, he states that the defendants failed to (1) speak with Dr. Bloomgarden, the surgeon; (2) contact any of the plaintiff's treating physicians or provide them with Dr. Tantuwaya's report; or (3) refer the plaintiff for an independent medical examination (see Doc. 68, p. 17; see Doc. 68-2, pp. 74, 86, 185-86). Fuller said that the defendants' failures to request an independent medical examination and to provide Dr. Tantuwaya's report to the plaintiff's treating physician are contrary to fair claims practices (Doc. 68-13, p. 13). In summary, Fuller opined that the "claim process showed a complete disregard for an insurer's duty of good faith and fair dealing..." (id., p. 16).

The defendants' motion for summary judgment does not address these alleged deficiencies in their investigation (see Doc. 59, pp. 14-18). Therefore, genuine issues of material fact presently remain regarding whether the defendants conducted a reasonable investigation of the cause of the plaintiff's disability.

Nonetheless, the defendants suggest that the plaintiff's claim fails because there is no evidence of a bad faith motive (id., p. 18). However, the

plaintiff responds that a bad faith motive can be inferred from the defendants' financial interest in the outcome of the claim (Doc. 68, p. 18). See De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., supra, 849 A.2d at 388 (bad faith may be based on an "interested" motive). In this regard, the plaintiff asserts that, by characterizing the plaintiff's disability as a sickness instead of an injury, it saves the defendants approximately $1.8 million dollars (Doc. 68, p. 18, n. 6).[9] In light of this circumstance, whether the defendants' alleged unreasonable investigation was motivated by financial gain is a factual issue that is not proper for summary dismissal.

The plaintiff points out that this case is strikingly similar to Uberti v. Lincoln National Life Ins. Co., supra, 144 F.Supp.2d 90, which also involved a dispute whether an insured's disability was due to accidental bodily injury or to sickness. The claims examiner concluded, based upon her review of the available records, that the insured's disability from a knee impairment was due to a sickness rather than an accident without doing such things as

---

[9]Thus, the plaintiff argues that, based on Social Security actuarial tables, he has a life expectancy of approximately sixteen years past his sixty-fifth birthday. Assuming the permanency of this disability and a monthly benefit of $9,000, the plaintiff would receive $1.8 million dollars that he would not be entitled to under the policy's sickness provision (see Doc. 68, p. 18, n. 6).

conferring with the treating specialist, obtaining an independent medical examination, or following recommendations for further investigation. The Connecticut federal judge found that the examiner had caused a breach of the insurer's duty of good faith and fair dealing when the insured's benefits were terminated as a result of the conclusion that the disability was due to sickness.

It is recognized that the deficiencies in <u>Uberti</u> were somewhat greater than in this case. Nevertheless, that decision demonstrates that the type of investigation that was conducted here could support a finding of a breach of the duty of good faith and fair dealing. Whether the inadequacies here after the plaintiff's statement on May 15, 2006, rise to that level is for a jury to decide.

On the other hand, the plaintiff's contention that the defendants breached their common law duty of good faith and fair dealing by failing to investigate prior to May 15, 2006, whether the cause of his disability had changed from sickness to an accidental bodily injury is unmeritorious. Thus, under the circumstances of this case, the failure to conduct such an investigation prior to May 15, 2006, was, at most, negligence, and negligence is an insufficient basis for this claim as a matter of law. <u>See</u> <u>De La Concha of</u>

Hartford, Inc. v. Aetna Life Ins. Co., supra, 849 A.2d at 388. Consequently, the plaintiff will be prohibited from arguing, or adducing evidence at trial, that the defendants' conduct regarding his disability claim prior to May 15, 2006, constitutes a breach of their common law duty of good faith and fair dealing. Rule 56(d)(1), F.R.Civ.P.

The defendants presented evidence that they did not know prior to May 15, 2006, that the plaintiff was claiming that the cause of his disability had changed from sickness to an accidental bodily injury that occurred during surgery (see Doc. 68-2, pp. 173-74; see also Doc. 57, PLACL00577). In this connection, the plaintiff's claim form asserts disability due to sickness, and the plaintiff and his counsel were informed that he was receiving disability payments based on his sickness (Docs. 59-6, 59-11). The plaintiff, who was represented by counsel, did not amend his claim form to assert disability due to accidental injury, or tell the defendants prior to May 15, 2006, that they were incorrectly processing the claim, even though the plaintiff, a physician who specialized in orthopedic surgery, or his lawyer, would be in the best position to alert the defendants to this change (see Doc. 59-18, p. 2; Doc. 57,

PLACL00577). Furthermore, there was no indication in the operative report of any complications during the surgery (see Doc. 59-8, p. 1).

The plaintiff's expert states that the defendants' "assertion that Dr. Sterling was responsible for changing the nature of his condition from Sickness to Accident places an undue burden upon Dr. Sterling" (Doc. 68-13, p. 13). I reject the contention that, under the circumstances of this case, it places an undue burden on the plaintiff, a physician whose speciality is orthopedic surgery and who is represented by counsel, to merely amend a form to reflect an alleged change in the etiology of his disability, especially since the operative record does not indicate any accidental injury.

The plaintiff argues that the defendants had a duty to investigate the cause of his disability based on his comments to employees that a cerebrospinal fluid leak during surgery resulted in paralysis of his left arm, and physician notes dated October 16, 1998, which stated "complicated by CSF leak," "nerve damage," "Dural tear," "N. Injury," and "Plexus injury" (Doc. 68, p. 16). However, none of these comments state that the origin of the plaintiff's disability had changed, and claims adjusters Nancy Smith and Sally Moore testified that these comments did not indicate to them that the basis for

the disability claim had changed (see Doc. 68-6, pp. 20-21, 26-27, 40-41, 52; Doc. 68-7, pp. 14-16, 22-23). Thus, Smith stated pointedly that "never in [her] mind" did she think the claim should be evaluated as an injury (Doc. 68-6, p. 53). Moore similarly testified that "[t]here was never even a thought" about whether it was an injury because "[n]othing in the claim file...indicate[d] to [her] that this was an injury" (Doc. 68-7, pp. 11-12, 15). In addition to the fact that the operative report does not reflect any complications, Moore stated that there was no indication in the supplemental attending physician statements that there was a change in the etiology of the plaintiff's disability (see id., p. 21).

Rather, Smith and Moore stated that they had accepted the plaintiff's representation that he was disabled due to sickness, and that they did not perceive the cause of the disability to be an issue because the claim was being paid accordingly (see id., pp. 18, 29; Doc. 68-6, pp. 22, 52). Further, at the time that the comments referenced by the plaintiff were made, the focus was on determining when the plaintiff would be returning to work (see Doc. 68-6, p. 26)(requesting a personal visit with the plaintiff regarding what were his plans for returning to work and when he would be seeing

patients). In this regard it is noted that, even after the plaintiff's arm paralysis was discovered, the parties initially expected that the plaintiff's disability would be temporary (see Doc. 57, PLACL00385-00386 (the plaintiff told Smith in October 1998, that his doctor expected that he would be back to work in five to eighteen months); Doc. 68-7, pp. 38-39 (it was not until August 2000 that Moore referred the plaintiff's claim to "extended duration," which indicates that the individual is expected to be disabled for an extended time period)). Moore added, reasonably enough, that "if anything came up that was contrary to how we were handling the claim [Sterling] or the attorney that was representing Dr. Sterling would bring [it] to our attention" (Doc. 68-7, p. 16).

Importantly, the plaintiff has also failed to adduce any evidence that the defendants acted in bad faith in failing to investigate prior to May 15, 2006, the etiology of his disability. To the contrary, Smith and Moore testified that they believed they were fulfilling their duty to the plaintiff by paying his sickness claim as he requested (see id., pp. 10, 17; Doc. 68-6, p. 22). Thus, Moore testified that she had "a duty to continue to pay the claim based on his sickness...[and] throughout this whole time, I was paying him based on a

sickness" (Doc. 68-7, p. 10; see also id., p. 17). Smith similarly stated that her duty was to pay his claim (Doc. 68-6, p. 22).

Moreover, because this claim was not viewed as a permanent disability at the time the referenced comments and notations were made (see Doc. 68-7, pp. 38-39)(referring the claim in August 2000 to "extended duration"), the suggestion that the defendants intentionally failed to investigate the cause of the plaintiff's disability for financial gain is unpersuasive. Thus, the payout to the plaintiff for the expected temporary disability would have been the same whether it was caused by sickness or accidental bodily injury.

In sum, viewing the evidence in the light most favorable to the plaintiff, the defendants' alleged failure to investigate prior to May 15, 2006, does not even appear to be negligence. But even if the omission rose to that level, it certainly was no more than negligence. That, as indicated, is an insufficient basis to support a claim for a breach of the common law duty of good faith and fair dealing. Therefore, summary judgment in the defendants' favor is warranted on this claim with regard to the defendants' failure to investigate the cause of the disability prior to May 15, 2006. See Rule

56(d)(1), F.R.Civ. P. (stating that "[i]f summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue"). Accordingly, as indicated, the plaintiff will be prohibited from arguing, or adducing evidence at trial, that the defendants' conduct regarding his disability claim prior to May 15, 2006, constitutes a breach of their common law duty of good faith and fair dealing. The presentation of such evidence would result in a waste of time and create the potential for jury confusion.

C. The defendants also seek summary judgment on the plaintiff's claim of negligent infliction of emotional distress (Doc. 59, pp. 19-20). "[I]n order to prevail on a claim of negligent infliction of emotional distress [under Connecticut law], the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." Carrol v. Allstate Ins. Co., 815 A.2d 119, 128 (Conn. 2003).[10]

---

[10]In contrast, a claim for intentional infliction of emotional distress requires that the defendants' conduct "exceed[] all bounds usually tolerated by decent society, and [be]...calculated to cause, and...cause...mental distress of a very serious kind." DeLaurentis v. City of New Haven, 597 A.2d 807 (Conn. 1991). Such a claim has previously been dismissed.

The defendants argue in a conclusory manner that the plaintiff "has not produced sufficient evidence from which a jury could reasonably conclude that the discontinuation of benefits pursuant to policy terms created an unreasonable risk of causing [him] emotional distress" (Doc. 59, p. 19). This contention is unpersuasive.

Not only does the alleged wrongful discontinuation of $9,000 in monthly benefits reasonably present such a risk, the plaintiff said to the defendants that it was causing him significant emotional distress. Thus, the plaintiff told a claims handler in May 2006 that the company's discontinuation of disability benefits was "causing him a tremendous amount of sociologic stress...[and that he] is very, very unhappy and very, very upset, [and] very, very disturb[ed]" (Doc. 57, PLACL00578). The defendants, furthermore, have not asserted any cogent argument that the insured's reaction was unreasonable. See Carrol v. Allstate Ins. Co., supra, 815 A.2d at 128 ("the fear or distress experienced by the plaintiffs [must] be reasonable in light of the conduct of the defendants").

The defendants assert further that the plaintiff failed to create a genuine issue of material fact regarding the severity of his emotional distress.

In addition to the plaintiff's statement that was just quoted, the plaintiff has testified that the defendants' discontinuation of his benefits "emotionally and psychologically destroyed" him (Doc. 59-22, p. 1).

The defendants argue that this evidence is insufficient because it does not show emotional distress "so severe as to cause illness or bodily harm" (Doc. 59, p. 19). Additionally, the defendants emphasize that the plaintiff has not sought "psychological, psychiatric, or mental health counseling" for his emotional distress (id., p. 20).

However, as the plaintiff points out (Doc. 68, p. 21), he does not have to show illness or bodily harm; rather, "[t]he only requirement is that the distress might result in illness or bodily harm." Carrol v. Allstate Ins. Co., supra, 815 A.2d at 129 (emphasis in original). Further, the defendants have not presented any legal authority that the failure to seek mental counseling precludes this claim. See id., n. 12 (noting that Missouri's requirement that the distress "be medically diagnosable and of sufficient severity to be medically significant" is different from Connecticut's requirements to establish an emotional distress claim). Therefore, the defendants have failed to show that the plaintiff's testimony that he was "emotionally and

psychologically destroyed" is insufficient to create a genuine issue of material fact regarding the severity of his emotional distress.

Accordingly, the defendants are not entitled to summary judgment on the plaintiff's claim of negligent infliction of emotional distress.[11]

D. The defendants next seek summary judgment on Counts Five and Six of the plaintiff's complaint, which allege that the defendants' conduct violated the Connecticut Unfair Insurance Practices Act ("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUTPA") (Doc. 1, pp. 8-9). CUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. §42-110b(a). CUIPA defines "unfair methods of competition" and "unfair or deceptive act[s]" in the insurance trade. Conn. Gen. Stat. §38a-815.[12]

The plaintiff acknowledges that "Connecticut courts generally do not recognize a private cause of action under CUIPA" (Doc. 68, p. 22).

_____

[11]Seemingly. this claim is simply a second ground. in addition to the bad faith claim, for the recovery of compensatory damages for emotional distress. See Buckman v. People Express, Inc.. supra. 530 A.2d at 600-01; Uberti v. Lincoln National Life Ins. Co.. supra. 144 F.Supp.2d at 106.

[12]CUIPA lists sixteen "unfair claim settlement practices" which pertain to the processing and determination of insurance claims. See Conn. Gen. Stat. §38a-816(6).

However, "a plaintiff may use CUPTA [sic] as a vehicle to bring a claim for unfair settlement practices under CUIPA." Craig v. Colonial Penn Ins. Co., 335 F.Supp.2d 296, 308 (D. Conn. 2004).

In order to state a claim under CUTPA for unfair insurance practices, the plaintiff must establish that (1) the defendants engaged in an unfair and deceptive act prohibited by CUIPA that caused him harm, see Royal Indem. Co. v. King, 532 F.Supp.2d 404, 411 (D. Conn. 2008); and (2) the defendants "committ[ed] or perform[ed the act] with such frequency as to indicate a general business practice." Conn. Gen. Stat. §38a-816(6); Exantus v. Metropolitan Property & Cas. Ins. Co., 582 F. Supp.2d 239, 249 (D. Conn. 2008)("isolated instances of unfair settlement practices are not sufficient to establish a claim"). The defendants argue that the plaintiff has failed to satisfy both of these requirements (see Doc. 59, pp. 21-24).

The plaintiff has identified in his response several unfair acts prohibited by the CUIPA that the defendants allegedly committed in the processing of his disability claim (Doc. 68. p. 22). Thus, among others, the plaintiff alleges that the defendants "refused to pay Plaintiff's claim without conducting a reasonable investigation based upon all available information,"

and "failed to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of Plaintiff's claim," in violation of CUIPA, Conn. Gen. Stat. §§38a-816(6)(d), (n). Arguably, there is evidence to support both of these contentions.

The plaintiff alleges, further, that the defendants "have a lengthy track record of unfair claims handling practices that constitutes a general business practice" (Doc. 68, pp. 22-23). In this regard, the plaintiff relies upon a Multistate Market Conduct Examination ("MCE") which identifies "areas of concern" in the defendants' claims processing (id., pp. 23-24; see Doc. 68-12, pp. 10-25).[13] The plaintiff argues that several improper practices identified in the MCE were present in the handling of his claim (Doc. 68, p. 24). However, the MCE is inadmissible because it is hearsay. See Rules 801, 802, F.R.E.; cf. Craig v. Colonial Penn Ins. Co., 335 F.Supp.2d 296, 309 (D. Conn. 2004)(declining to consider a newspaper article as evidence of a general

---

[13]The MCE consisted of a team of examiners reviewing case files (Doc. 68-12, pp. 10-25). The examiners concluded that the level of claims handling errors warranted regulatory action, and the defendants agreed to a plan of corrective action implemented through a regulatory settlement agreement or consent orders. The regulatory settlement agreement mentioned in the MCE is inadmissible. See Rule 408, F.R.E.

practice under CUIPA because, among other things, it is inadmissible hearsay).

At the hearing on this matter, the plaintiff argued that the MCE is admissible because his insurance claims and administration expert, Mary E. Fuller, may rely on inadmissible evidence. In this regard, Rule 703, F.R.E., states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Rule 703, F.R.E., does not aid the plaintiff in this case. "Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury. In such a case, Rule 703 is simply inapplicable and the usual rules regulating the admissibility of evidence

control." 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence §6273, p. 312 (1997).

Moreover, even if an expert such as Fuller could drag hearsay into evidence, she does not purport to do so in her affidavit regarding the CUIPA or CUTPA claims.[14] In fact, Fuller states that she is not qualified to give an expert opinion on the CUIPA and CUTPA claims. Thus, she explains (Doc. 68-13, p. 16):

> UNUM Provident challenged Dr. Sterling's... Claims of CUIPA and CUTPA Violations. I am not able to comment as to this, as it involves legal argument and facts...which extend beyond my expertise as an [sic] Disability Claims Expert Witness.

Consequently, the MCE cannot be considered in support of the plaintiff's claim that the defendants generally engaged in unfair business practices violative of CUIPA. See Macuba v. Deboer, 193 F.3d 1316, 1323-24 (11th Cir. 1999)(hearsay must be reducible to admissible form for consideration on summary judgment).

---

[14]Thus, with regard to the MCE, she merely asserts that she had "bec[o]me aware of the Provident practices and protocols that were utilized" prior to Provident's merger with Unum and that "many of these practices were identified in the [MCE] to be areas of concern relative to Fair Claims Practices" (Doc. 68-13, p. 6).

Because the plaintiff has not identified admissible evidence

showing that the defendants engaged in a pattern of unfair business practices

violative of the statutes, the CUTPA and CUIPA claims will be dismissed.[15]

Accordingly, summary judgment will be granted in the defendants' favor on

Counts Five and Six of the plaintiff's complaint.

E. Finally, the defendants argue that the plaintiff's claim for

punitive damages should be stricken (Doc. 59, p. 24). The defendants point

---

[15]Subsequent to the filing of its summary judgment opposition memorandum, the plaintiff submitted as supplemental authority the case of Merrick v. Paul Revere Life Ins. Co., Case No. CV-S-00-0731-JCM-RJJ (D. Nev. 2008) (see Docs. 81, 83). The plaintiff proffers as evidence of a pattern of unfair business practices the Merrick court's statement that "Defendants repeatedly subjected [insured] and thousands of others to their bad practices and subjected hundreds of thousands to the risk of those bad practices" (Doc. 78, p. 2, ¶ 6a (citing Doc. 83-2, p. 33)). This is a far-reaching conclusory statement that does not specify the bad practices or identify the evidence upon which this conclusion is based. If the plaintiff wished the court to consider the evidence underlying the Nevada court's conclusion, it should have submitted that evidence in this case. It is also noted that the Merrick opinion reflects practices that have not been shown to be applicable in this case. See, e.g., Doc. 83-2, pp. 3, 4 (round table reviews, employees instructed to limit independent medical examinations).

The plaintiff also cites the Merrick court's statements that the defendants "improperly shifted the burden of claims to the insured" and that "employees were instructed to limit their use of independent medical examinations" (Doc. 78, p. 3, ¶¶ d, e). As indicated, the evidentiary basis for these statements is unknown. Further, with regard to the limitations on independent medical examinations, the plaintiff has not cited to any evidence that any claims processor in this case was told to limit the use of independent medical examinations.

It is also noted that the plaintiff has only referred to the Merrick court's findings of general practices by the defendants. The plaintiff has failed to identify, and provide supporting record citations for, the specific unfair practices committed by the defendants that Merrick and the plaintiff commonly experienced.

-45-

out that "[p]unitive damages are ordinarily not available in a contract action, unless malicious or reckless conduct is alleged and shown" (id.).

The plaintiff seeks punitive damages for the defendants' alleged breach of the common law duty of good faith and fair dealing (Doc. 1, pp. 5-6). Punitive damages are available under Connecticut law on this type of claim. However, Uberti v. Lincoln National Life Ins. Co., supra, demonstrates that such damages are not warranted under the circumstances of this case.

As previously explained, Uberti was very similar to this case. However, the deficiencies in the investigation there were greater than those in this case. The Connecticut court concluded that, while the deficiencies established a breach of the implied covenant of good faith and fair dealing, they did not provide an evidentiary basis for an award of punitive damages. The court said that "[t]he plaintiff's proof that [the insurer's] unreasonable action was the result of an arbitrary and unsupported determination based on a known inadequate investigation and inconsistent with the policy language, while sufficient to prove bad faith, does not contain sufficient indicia of bad motive, wantonness, or outrageousness to warrant imposition of punitive damages." 144 F.Supp.2d at 107.

I find this conclusion persuasive. Since the district judge in Connecticut obviously has a better understanding and feel for Connecticut law than I do, it is appropriate to rely upon his determination. Because the deficiencies in this case do not reach the level that was present in <u>Uberti</u>, that decision shows, <u>a fortiori</u>, that punitive damages should not be awarded here. Accordingly, the request for such damages in Count Two will be deemed stricken.

It is, therefore, upon consideration

ORDERED:

That Defendant UnumProvident Corporation's Motion for Final Summary Judgment and Defendant Provident Life and Accident Insurance Company's Motion for Partial Summary Judgment (Doc. 59) is hereby **GRANTED** to the extent that judgment as a matter of law will be entered in the defendants' favor on the plaintiff's CUIPA and CUTPA claims (Counts Five and Six of the complaint), and Counts Five and Six will be **DISMISSED**. Summary judgment will also be entered in the defendants' favor on Count Two of the plaintiff's complaint with regard to the plaintiff's allegation that the defendants' conduct prior to May 15, 2006, breached Connecticut's

common law duty of good faith and fair dealing.  Further,  the allegation of repudiation contained in Count One and the claim for punitive damages in Count Two will be deemed **STRICKEN**.  In all other respects, the motion is hereby **DENIED**.

DONE and ORDERED at Tampa, Florida, this ___ day of March, 2009.

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE